# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TONY COBOS, | 1:07-CV-00072 AWI DLB HC |
| Petitioner, | FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| MENDOZA-POWERS, Warden, | [Doc. 1] |
| Respondent. | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## BACKGROUND

Petitioner is currently in custody of the California Department of Corrections and Rehabilitation following his conviction in the Los Angeles County Superior Court of first degree murder. (Exhibit 1, attached to Answer.) Petitioner was sentenced to 25 years-to-life. (Id.)

In the instant petition, Petitioner does not challenge the validity of his conviction; rather he challenges a 2005 Board of Parole Hearings' (BPH) decision finding him unsuitable for parole. (Exhibit 2, attached to Answer.)

On June 5, 2006, Petitioner filed a petition for writ of habeas corpus in the Kings County Superior Court. (Exhibit 6, attached to Answer.) The petition was denied on July 7, 2006, in a reasoned decision. (Id. at 1.) The court concluded that some evidence in the record supported the BPH's decision. (Id.)

Petitioner then filed a petition for writ of habeas corpus in the California Court of Appeal. (Exhibit 7, attached to Answer.) The petition was summarily denied. (Id.)

Petitioner also filed a petition for review in the California Supreme Court. (Exhibit 8, attached to Answer.) That petition was also summarily denied. (Exhibit A, attached to Petition.)

Petitioner filed the instant federal petition for writ of habeas corpus on January 16, 2007.

Respondent filed an answer on June 26, 2007, and Petitioner filed a traverse on July 26, 2007. (Court Docs. 7, 9.)

## STATEMENT OF FACTS[1]

On December 1, 1985, Petitioner's friends murdered Martin Osuna's girlfriend. On December 6, 1985, Petitioner talked with his friends regarding their belief that Osuna was planning to retaliate against them for killing his girlfriend and, in response, Petitioner and his friends planned to kill Osuna. Later that day, Petitioner and one of his co-defendants brought Osuna to his home, where an argument ensued and Osuna left. Petitioner and the co-defendant pursued Osuna so that he would not leave. Petitioner and his friends got into a car with Petitioner driving, Osuna in the passenger seat, and the co-defendants in the back seat. Petitioner stopped the car and one of his co-defendants engaged in a physical altercation with Osuna. Petitioner then grabbed Osuna by the legs and began stabbing his repeatedly in the back and buttocks. Osuna was stabbed approximately 39 times, which resulted in his death. Petitioner and the others removed Osuna's bloody body from the car and Petitioner told a co-defendant to "be sure he's dead" and the co-defendant repeatedly stabbed Osuna in the neck. Petitioner subsequent removed the victim's shirt and jacked, and joked about how many holes were in the jacket. The victim's body was covered in drapes taken from Petitioner's home and dumped in an isolated area in the mountains. Petitioner subsequently instructed a co-defendant to dismantle the car so that any evidence would be destroyed.

///

---

[1] This statement of facts is taken, in combination, from the California Court of Appeals decision in Petitioner's underlying direct appeal, the Probation Officer's Report, and BPH's transcript, attached as Exhibits 2, 3 & 5, to Answer.

DISCUSSION

I.       Standard of Review

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

Petitioner is in custody of the California Department of Corrections pursuant to a state court judgment. Even though Petitioner is not challenging the underlying state court conviction, 28 U.S.C. § 2254 remains the exclusive vehicle for her habeas petition because she meets the threshold requirement of being in custody pursuant to a state court judgment. Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-1127 (9th Cir.2006), *citing* White v. Lambert, 370 F.3d 1002, 1006 (9th Cir.2004) ("Section 2254 'is the exclusive vehicle for a habeas petition by a state prisoner in custody pursuant to a state court judgment, even when the petition is not challenging [her] underlying state court conviction.'").

The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death Penalty Act which became effective on April 24, 1996. Lockyer v. Andrade, 538 U.S. 63, 70 (2003). Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer, 538 U.S. at 70-71; see Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71,

3

1  *quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this
2  Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as
3  of the time of the relevant state-court decision." <u>Id.</u>, *quoting* <u>Williams</u>, 592 U.S. at 412. "In other
4  words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or
5  principles set forth by the Supreme Court at the time the state court renders its decision." <u>Id</u>.

6  Finally, this Court must consider whether the state court's decision was "contrary to, or
7  involved an unreasonable application of, clearly established Federal law." <u>Lockyer</u>, 538 U.S. at
8  72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may
9  grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme]
10 Court on a question of law or if the state court decides a case differently than [the] Court has on a
11 set of materially indistinguishable facts." <u>Williams</u>, 529 U.S. at 413; <u>see also</u> <u>Lockyer</u>, 538 U.S.
12 at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the
13 state court identifies the correct governing legal principle from [the] Court's decisions but
14 unreasonably applies that principle to the facts of the prisoner's case." <u>Williams</u>, 529 U.S. at
15 413.

16 "[A] federal court may not issue the writ simply because the court concludes in its
17 independent judgment that the relevant state court decision applied clearly established federal
18 law erroneously or incorrectly.  Rather, that application must also be unreasonable." <u>Id</u>. at 411.
19 A federal habeas court making the "unreasonable application" inquiry should ask whether the
20 state court's application of clearly established federal law was "objectively unreasonable." <u>Id</u>. at
21 409.

22 Petitioner has the burden of establishing that the decision of the state court is contrary to
23 or involved an unreasonable application of United States Supreme Court precedent. <u>Baylor v.</u>
24 <u>Estelle</u>, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the
25 states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a
26 state court decision is objectively unreasonable. See <u>Clark v. Murphy</u>, 331 F.3d 1062, 1069 (9th
27 Cir.2003); <u>Duhaime v. Ducharme</u>, 200 F.3d 597, 600-01 (9th Cir.1999).

28 AEDPA requires that we give considerable deference to state court decisions. The state

1 court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). We are bound by a state's
2 interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.2002), *cert. denied*,
3 537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

II.     Review of Claims

A parole release determination is not subject to all the due process protections of an adversary proceeding. Pedro v. Oregon Parole Board, 825 F.2d 1396, 1398-99 (9th Cir. 1987); see also Greenholtz, 442 U.S. at 12 (explaining that due process is flexible and calls for procedural protections that particular situations demand). "[S]ince the setting of a minimum term is not part of a criminal prosecution, the full panoply of rights due a defendant in such a proceeding is not constitutionally mandated, even when a protected liberty interest exists." Pedro, 825 F.2d at 1399; Jancsek v. Oregon Bd. of Parole, 833 F.2d 1389, 1390 (9th Cir.1987). At a state parole board proceeding, the only process to which an inmate is entitled is: 1) the inmate must receive advance written notice of a hearing, Pedro, 825 F.2d at 1399; 2) the inmate must be afforded an "opportunity to be heard," Greenholtz, 442 U.S. at 16; 3) if the inmate is denied parole, the inmate must be told why "he falls short of qualifying for parole," Id.; and 4) the decision of the Board must be supported by "some evidence" having an indicia of reliability, Superintendent, Mass. Correc. Inst. v. Hill, 472 U.S. 445, 455 (1985); Cato v. Rushen, 824 F.2d 703, 705 (9th Cir.1987).

"In Superintendent v. Hill, the Supreme Court held that 'revocation of good time does not comport with 'the minimum requirements of procedural due process,' unless the findings of the prison disciplinary board are supported by some evidence in the record.' 472 U.S. 445, 454 (1985), *quoting* Wolff v. McDonnell, 418 U.S. 539, 558 (1974)." Sass, 461 F.3d at 1128. In determining whether the "some evidence" standard is met, the Court need not examine the entire record, independently assess the credibility of witnesses, or re-weigh the evidence. Id. Rather, the Court must determine whether there is any evidence in the record that could support the conclusion of the disciplinary board. Id., *citing* Superintendent v. Hill, at 455-56. Although Hill involved the accumulation of good time credits, the same standard applies to parole, as both situations "directly affect the duration of the prison term." Id., *citing* Jancsek v. Oregon Bd. of

5

1  Parole, 833 F.2d at 1390.

2  With regard to the procedural protections outlined in Greenholtz, as Respondent submits
3  and Petitioner concedes, Petitioner was provided all that is required. Petitioner was provided
4  with advance notice of the hearing, representation by counsel at the hearing, an opportunity to
5  submit materials for the Board's consideration, an opportunity to be heard during the hearing,
6  and a written decision explaining the reasons why parole was denied. See Exhibit 2, Answer.

7  In the instant petition, Petitioner contends that: (1) the evidence does not support a
8  finding that he renders an unreasonable risk to public safety; (2) the BPH erroneously applied the
9  "some evidence" standard; (3) the BPH operates under a no-parole policy rendering every
10 decision arbitrary and capricious; (4) the BPH did not substantiate its denial of parole review for
11 a three year period; (5) it was unreasonable and unconstitutional for the BPH to require Petitioner
12 to find employment in the community; and (6) he was denied a fair hearing by the BPH's failure
13 to list the mitigating factors. (See Petition, at 5, 8-9.)

14 At Petitioner's second 2005 parole hearing, the BPH relied on several factors in denying
15 parole including Petitioner's commitment offense, his unstable social history, lack of
16 participation in beneficial self-help and/or therapy programs while incarcerated, lack of
17 demonstration of evidence of positive change, misconduct during incarceration, and the
18 inconclusive psychological report. (See Exhibit 2, at 67-72.)

19 The first and primary factor the BPH relied on was the fact that the first degree murder
20 offense was carried out in a dispassionate and calculated manner, and the motive for the crime
21 was very trivial in relation to the offense.[2] (Exhibit 2, 67; Cal.Code Regs. tit. 15, §

---

[2] Pursuant to Title 15, of the California Code of Regulations, Section 2402(c)(1) sets forth circumstances tending to demonstrate unsuitability for parole regarding the committed offense. The factors to be considered include:
    (A) Multiple victims were attacked, injured or killed in the same or separate incidents.
    (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
    (C) The victim was abused, defiled or mutilated during or after the offense.
    (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
    (E) The motive for the crime is inexplicable or very trivial in relation to the offense.

15 Cal.Code Regs. § 2402(c)(1)(A)-(E).

2402(c)(1)(B), (C).)  "Some evidence" clearly supports the BPH's finding.[3]  Under California law, the commitment offense and past convicted offenses alone provide a sufficient basis to deny parole.  In re Dannenberg, 34 Cal.4th at 1061, 1095 (2005); Cal. Penal Code § 3041(b).  In order to find that an offense was committed "in an especially heinous, atrocious or cruel manner" there must be some evidence that the "violence and viciousness of the inmate's crime" is greater than that which is "minimally necessary to convict [the defendant] of the offense for which he is confined.  (15 Cal. Code Regs. § 2402(c)(1); In re Dannenberg, 34 Cal.4th 1061, 1095 (2005).  First degree murder is defined as "murder which is perpetrated by any kind of willful, deliberate and premeditated killing with express malice aforethought. [¶] The word 'willful,' as used in this instruction, means intentional. [¶] The word 'deliberate' means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.  The word 'premeditated' means considered beforehand." (CALJIC 8.20.)  Malice by itself involves "'an element of viciousness-an extreme indifference to the value of human life.'" (People v. Summers, 147 Cal.App.3d 180, 184 (1983).

Here, Petitioner and his co-defendants planned the murder in response to various threats the victim had apparently made to Petitioner's family members and for their fear that the victim was going to retaliate against them for killing his girlfriend.  Petitioner and his co-defendants took the victim to Petitioner's house and captured him after he attempted to leave.  They drove the victim to a location where he was stabbed approximately 39 times by Petitioner.  His body was subsequently removed from the vehicle and, at Petitioner's request, one of his co-defendants repeatedly stabbed the victim again to make sure he was dead.  The victim was covered with a

---

[3]  Pursuant to Title 15, of the California Code of Regulations, Section 2402(c) sets forth circumstances tending to demonstrate unsuitability for parole when the prisoner committed the offense in an especially heinous, atrocious or cruel manner.  The factors to be considered include:
    (A) Multiple victims were attacked, injured or killed in the same or separate incidents.
    (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
    (C) The victim was abused, defiled or mutilated during or after the offense.
    (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
    (E) The motive for the crime is inexplicable or very trivial in relation to the offense.

15 Cal.Code Regs. § 2402(c)(1)(A)-(E).

drape from Petitioner's home and dumped in the mountains.  The calculated and cold blooded murder of the victim definitely exceeds the minimum elements necessary for a conviction of first degree murder.  In re Rosenkrantz, 29 Cal.4th 616, 667 (2002).  Based on these circumstances, the BPH's finding that the first degree murder was carried out in a dispassionate and calculated manner is clearly supported by "some evidence" and supports the BPH's finding that the circumstances of the commitment offense demonstrate that Petitioner poses an unreasonable risk to public safety if released.

As previously stated, the BPH found that the motive for the offense was very trivial.  (Exhibit 2, at 67; Cal.Code Regs. tit. 15, § 2402(c)(1)(E).)  In fact, the BPH noted that there did not appear to be any motive for the offense.  Although there was mention that the murder was planned and executed in response to a threat of retaliation by the victim, this was never substantiated, and "some evidence" supports the BPH's finding.  **(**See Exhibit 2, at 74.**)**

The Court acknowledges that the Ninth Circuit has stated "continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation."  Biggs v. Terhune. 334 F.3d 910, 916-917 (9th Cir. 2003).  In Sass v. California Board of Prison Terms, 461 F.3d 1123 (9th Cir. 2006), the Ninth Circuit held that it was not a per se due process violation if the Board determines parole suitability based solely on the unchanging factors of the commitment offense and prior offenses.  Sass, at 1129 (prisoner's commitment offenses in combination with prior offenses amounted to some evidence to support the Board's denial of parole).  In Irons v. Carey, 505 F.3d 846, as amended, (July 13, 2007), the Ninth Circuit again upheld the denial of parole based on the prisoner's commitment offense and prior criminal history, but acknowledged the continuing validity of the holding in Biggs, and finding that relief for Irons was foreclosed by Sass.  The Court pointed out that in the cases where it previously found that the denial of parole based solely on the commitment offense withstood a due process challenge, the prisoners had not yet served the minimum number of

years for which they were sentenced.[4]  Irons, at 853-854.  In the instant case, at the time of the 2005 parole hearing, Petitioner had only been incarcerated for 19 years of his 25 years to life sentence.[5]  In addition, Petitioner's minimum eligible parole was three years prior, on June 21, 2002, and this was his second denial of parole.  Thus, even if this was the sole basis of the BPH's denial, the concerns expressed in Biggs and its progeny are not present here, and "some evidence" supports the BPH's finding that the circumstances of the commitment offense demonstrate that Petitioner presently poses an unreasonable risk to public safety.

The BPH stated that Petitioner had an unstable social history which may be properly considered as a circumstance tending to indicate unsuitability for parole.  See Cal.Code Reg. tit. 15, § 2402(c)(3).  The BPH noted that Petitioner had engaged in escalating drug use, as well as illegal drug sales.  Petitioner admitted that his drinking and drug usage began in high school, as a result of peer pressure. (Exhibit 2, at 22-23.)  Petitioner was arrested for possession of controlled substances for sale, which was later dismissed.  (Id. at 69.)  There is "some evidence" to support the BPH's reliance on this circumstance.  Although the presence of an unstable social history is not, by itself, sufficient to support a finding that an inmate is unsuitable, it can and was in this instance considered as part of the overall finding.  "Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.  Cal. Code Regs. tit. 15, § 2402(b).

The BPH found that Petitioner had not sufficiently participated in beneficial self-help

---

[4] Most recently in Hayward v. Marshall, __ F.3d __, 2008 WL 43716 (9th Cir. January 3, 2008), the Ninth Circuit, in reversing the denial of parole, again affirmed its prior comments in Biggs, Sass, and Iron, that "'in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes.'" Hayward, 2008 WL at *7 (citing Irons, 2007 WL 2027359, at *6.)  In addition, the Ninth Circuit clarified that for purposes of collateral review "'[t]he test is not whether some evidence supports the reasons the Governor cites for denying parole, but whether some evidence indicates a parolee's release unreasonably endangers public safety.  Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers public safety." Hayward, at *5 (cases citations therein.)
 The United States Supreme Court has not spoken on the issue of whether and when the denial of parole based solely on the continued reliance of the circumstances of the commitment offense results in a due process violation, and there is no clearly established Supreme Court authority on this issue.

[5] Petitioner's sentence began on December 19, 1986, and the instant parole hearing was conducted on August 31, 2005.  (Exhibit 2, at 1.)

9

and/or therapy programs while incarcerated. Section 2402(b) states that "[a]ll relevant, reliable information available to the panel shall be considered in determining suitability for parole." It was noted that although Petitioner had participated in the Twelve Step Alcoholics Anonymous ("AA") program, he could not identify any of the Twelve steps. (Exhibit 2, at 42-43, 69-70.) The BPH was legitimately concerned that, given Petitioner's lengthy participation in AA, his failure to be able to identity the very teachings of the program created a doubt that he could or would actual implement such programming if released. (Id. at 69-70.) The BPH found that further therapy was needed in order to "face, discuss, understand, and cope with stress in a nondestructive manner." (Id. at 71.) The BPH further noted that Petitioner's gains were recent and he must demonstrate an ability to maintain such gains over an extended period of time to find that he no longer poses an unreasonable threat to public safety. (Id.)

Next, the BPH found that Petitioner had failed to demonstrate evidence of positive change. Petitioner has received fourteen serious 115 disciplinary reports. (Exhibit 2, at 70.) The last occurred in 1993. (Id.) The BPH noted the most recent occurred on June 9, 1993, for refusing a direct order. Prior to that, he received a disciplinary report on June 17, 1987, for possession of a hacksaw blade and a file. The BPH noted that he received several disciplinary reports for fighting, in his cell and on the yard. In addition, he received two disciplinary reports for manufacturing/possessing manufactured alcohol. (Exhibit 2, at 46-51; See Cal. Code Reg. tit. 15, § 2402(c)(6) (the Board may consider institutional behavior while in prison in determining whether prisoner poses an unreasonable risk of danger to society if released.). In addition, Petitioner has suffered seven 128(a) counseling chronos. (Exhibit B, at 51.) The most recent occurred on July 21, 1993, for abusing the appeal process. (Id.) Although Petitioner has not suffered any disciplinary infractions since 1993, as stated by the BPH, it must consider the entire record of incarceration which includes several serious rules violation, and "some evidence" supports the finding that Petitioner has made an adequate showing of positive change and therefore still presents an unreasonable danger to public safety.

The BPH found that the psychiatric evaluation dated March 19, 2005, authored by Dr. Schroder, was inconclusive as to Petitioner's risk assessment if released. (Exhibit 2, at 53-54.)

Therefore, the BPH reviewed the previous report, dated August 1, 2001, authored by Dr. Katzman, which was more extensive. (Id. at 54.) It was noted that Petitioner was assessed to be a lower than average risk for danger or violent behavior in a controlled setting. (Id.) The BPH noted, however, that Petitioner's success in a less-controlled setting was dependent largely on the ability to avoid drugs or alcohol. (Id. at 55.) As stated by the BPH, the psychologist report contained "iffy" language regarding Petitioner's potential risk, and "some evidence" supports the BPH's finding.

The BPH noted that the District Attorney opposed Petitioner's release. This was properly considered pursuant to Cal. Pen. Code § 3042(a) and (f)(3), and Cal. Code Reg. tit. 15, § 2402(b).

The BPH also considered factors favoring Petitioner's suitability for release, and commended Petitioner for obtaining his high school diploma, receiving no disciplinary reports or counseling chronos since 1993, participation in self-help programs such as AA and NA since 1993, participation in anger management programs in Criminon, receiving certificate in the FEMA and eagle program, as well as the interactive journaling, and also receiving laudatory chronos from the PIA and good work records. (Exhibit 2, at 72; Cal. Code Reg. tit. 15, § 2402(d).) However, on balance, these positive factors did not outweigh the factors of unsuitability. (Id.)

Petitioner contends that the BPH acted improperly by requiring employment plans and basing the three-year denial on the same factors as the actual parole denial, and by failing to consider mitigating facts. First, Petitioner's claim that the BPH failed to consider mitigating facts is based on his disagreement with the BPH's assessment of the evidence. In fact, as just noted, the BPH commended Petitioner on various positive factors. Petitioner contends that he had a stable social history, demonstrated signs of remorse and that the motive for his crime mitigated his culpability. The BPH disagreed finding Petitioner had an unstable social history, including tumultuous relationships with others and escalating drug use; there was no evidence as to why the murder was committed; and Petitioner needed additional self-help and therapy in order to learn to handle stress in an acceptable manner. (Exhibit 2, at 67-72.)

1    In his petition, Petitioner makes the blanket claim that the denial of his parole was the
2 result of a predetermined no-parole policy.  (Petition, at 5.)  Beyond this statement, Petitioner
3 does not expand on his claim, and the claim amounts to nothing more than a conclusory
4 allegation.  See Jones v. Gomez, 66 F.3d 199, 204-05 (9th Cir. 1995) (affirming district court's
5 denial of habeas relief where petitioner's conclusory allegations failed to meet the habeas rules'
6 specificity requirement); James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994) (underlining that
7 "[c]onclusory allegations which are not supported by a statement of specific facts do not warrant
8 habeas relief").
9    Petitioner's reliance on the case of Coleman v. Board of Prison Terms, 2005 WL
10 4622902 (E.D. Cal.), is inapposite.  There, the district court was presented with evidence in the
11 form of testimony by former BPT Commissioners, statements by Governor Davis that he would
12 deny parole to all murders, and statistics that only one prisoner out of 4,800 was released on
13 parole.  Based on that evidence, the district court concluded that the petitioner presented a
14 convincing case that under Governors Wilson and Davis there existed a sub rosa policy that all
15 murders would be found unsuitable for parole, and the court ordered a new parole suitability
16 hearing.  No such evidence exists here.  By the time of Petitioner's 2005 parole hearing,
17 Governor Schwarzenegger was in office and there is simply no evidence that he has implemented
18 a "no parole policy to all murders."
19    In sum, the Board considered all relevant evidence in this case and carefully balanced and
20 assessed the various factors. Those BPH's findings that Petitioner present poses an unreasonable
21 risk to public safety were supported by at least "some evidence" and it cannot be said that the
22 state court's resolution of Petitioner's claim "resulted in a decision that was contrary to, or
23 involved an unreasonable application of, clearly established Federal law, as determined by the
24 Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable
25 determination of the facts in light of the evidence before the state court."

RECOMMENDATION

27    Based on the foregoing, it is HEREBY RECOMMENDED that:
28    1.    The instant petition for writ of habeas corpus be DENIED; and,

12

1        2.       The Clerk of Court be directed to enter judgment in favor of Respondent.

2        This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Replies to the objections shall be served and filed within ten (10) court days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **March 14, 2008**                    /s/ **Dennis L. Beck**
                                         UNITED STATES MAGISTRATE JUDGE